ORIGINAL

AO 91 (Rev. 02/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

*FILED*

United States of America

v.

SERGEI VLADIMIROVICH SHKURKIN

*Defendant*

SEP 16 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case No.

**3 09 70830**

**BZ**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of    10/20/04 - 11/15/04    in the county of   SF & Alameda   in the   Northern   District of

California     , the defendant violated   18     U. S. C. §   894

, an offense described as follows:

"Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means:
(1) to collect or attempt to collect any extension of credit,    or
(2) to punish any person for the nonrepayment thereof, shall be fined under this title or imprisoned not more than 20 years, or both."

This criminal complaint is based on these facts:

See attached affidavit of Special Agent K.S. Bagchi.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

K.S. Bagchi, FBI Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 16 Sept 09

City and state:   San Francisco, CA

_____
*Judge's signature*

Magistrate Judge Bernard Zimmerman
_____
*Printed name and title*

AFFIDAVIT OF K. S. BAGCHI
IN SUPPORT OF A CRIMINAL COMPLAINT

I, K.S. Bagchi, Special Agent, Federal Bureau of Investigation (FBI), San Francisco, California,
being duly sworn, depose and state as follows:

1.  I am an investigative or law enforcement official of the United States appointed
    by the Attorney General and authorized to detect and prosecute crimes against the
    United States pursuant to Title 28, United States Code, Section 533.

2.  This affidavit is submitted in support of a criminal complaint charging SERGEI
    VLADIMIROVICH SHKURKIN with conspiracy to collect extensions of credit
    by extortionate means, in violation of 18 U.S.C. § 894 and arrest warrant.

## SECTION I: TRAINING AND EXPERIENCE; BASIS FOR INFORMATION

### A. TRAINING AND EXPERIENCE

3.  I am a Special Agent (SA) of the FBI and have been so employed since June of
    2000. During my employment as a Special Agent, I have been tasked with
    narcotics, terrorism, and organized crime investigations. Based on these
    investigations, I have gained experience with the use of a variety of law
    enforcement techniques including the following: analysis of financial, business,
    and electronic mail records; analysis of Bank Secrecy Act records; domestic and
    foreign witness interviews; collection of evidence through the use of Letters
    Rogatory and Mutual Legal Assistance Treaties; Ex Parte applications for tax
    information; utilization of electronic and wire interceptions; the utilization of
    cooperating witnesses and consensual recordings; the use of physical surveillance
    techniques including the use of pole cameras and recorders; the use of geographic
    analysis information regarding mobile telephone systems; the analysis of historical
    telephone records and the utilization of dialed number recorders (DNR) and
    trap/trace devices[1]; and various other types of electronic surveillance techniques
    such as body wires and transmitters. I have been the affiant in support of Title III
    authorized interception of wire communications, search warrants, and criminal
    complaints.

4.  I have investigated criminal enterprises that employ sophisticated money
    laundering techniques to conceal the profits of their illicit activities, to include the

---

[1] A dialed number recorder (DNR) is a device which when installed on a target telephone
will record all outgoing telephone numbers which are dialed by the target telephone and
trap/trace is a device that will record the telephone numbers of all incoming calls to the target
telephone.

BAGCHI AFFIDAVIT                    1

use of front companies, straw buyers, fraudulent invoices, international wire transfers and currency exchanges. My investigations have involved financial transactions conducted in numerous foreign countries to include Afghanistan, British Virgin Islands, United Arab Emirates, Estonia, Latvia, Monaco, and Switzerland.

## B.    BASIS OF INFORMATION

5.    The information contained in this affidavit is the result of an investigation conducted by your affiant, and information as related to your affiant by other law enforcement officers. Your affiant has relied on multiple sources of information, including but not limited to:

   a.    Bank records, to include: signature cards, bank statements, canceled checks, deposit items, wire transfers, bank correspondence, credit card statements, and investment account statements;

   b.    Loan documents, to include: loan applications, loan agreements, loan statements, loan payments, loan disbursement requests, financial statements, notes and memos to the loan file, and membership pledges;

   c.    Corporate documents, to include: board of director's minutes, limited liability operating agreements, contracts, articles of organization, auditor's reports, project income and expense statements, wage and employment records, Federal tax return and return information, invoices, and shipping records;

   d.    Correspondence, to include: letters, files, electronic mail, facsimiles, and other documents;

   e.    Domestic and foreign witness interviews;

   f.    Cooperating witness information and consensual recording;

   g.    Evidence obtained from search warrants; and

   h.    Subject interviews.

6.    Because this affidavit is submitted for the limited purpose of establishing probable cause for an arrest warrant, I have not included each and every fact known to me that supports probable cause for arrest. Rather, I have set forth only those facts that I believe are necessary to support a lawful arrest of SHKURKIN.

7.    Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this affidavit, such information is also described in sum and substance and in relevant part.

BAGCHI AFFIDAVIT                    2

## **SECTION II: PROBABLE CAUSE**

8.      As set forth more fully below, a company known as Golden Sierra Partners
        applied for a loan from a U.S. government agency to build a food industry project
        in Estonia. Members of the company and their associates fraudulently obtained the
        government loan by falsely representing a) that they contributed equity to the
        project and b) the cost (and acquisition) of equipment they intended to purchase as
        part of the project. In lieu of making equity contributions to the project, certain
        members of the project obtained a loan from a third party, which was used to
        create the false impression that they contributed their equity and they concealed
        that third party loan from the government agency. Thereafter, SHKURKIN and
        others conspired to collect that third party loan through extortionate means.

9.      On August 27, 2009, a federal grand jury in the Northern District of California
        returned an under seal indictment against several individuals in connection with
        the government agency's loan related to Golden Sierra Partners project. The
        indictment contains the following charges: conspiracy to commit mail and wire
        fraud (18. U.S.C. § 1349; count one); wire fraud (18 U.S.C. § 1343; counts two
        through six); money laundering conspiracy (18 U.S.C.§ 1956(h); count seven);
        and money laundering (18 U.S.C. § 1956(a)(2)(A); counts eight and nine).

## A.      **EQUITY AND EQUIPMENT REPRESENTATIONS**

10.     The Overseas Private Investment Corporation (OPIC) is a government agency
        (created under Title 22, United States Code, Section 2191) that encourages the
        participation of American companies in certain foreign business projects. OPIC
        provides financing, insurance, and/or guaranties for these projects outside the
        United States.

11.     On March 14, 2003, MARTIN WILLIAM WASHBURN[2], the President of
        FoodPro International, Inc. (FoodPro), filed an Application for Financing with
        OPIC on behalf of Golden Sierra Partners, LLC, also known as Golden Sierra
        Project ("GSP"), to build a state-of-the-art milling and bakery operation in
        Estonia. At the time, FoodPro maintained offices in San Jose and Stockton,
        California.

12.     Although WASHBURN filed the application with OPIC in March of 2003, GSP

---

[2] As part of the indictment referenced in Paragraph 7, WASHBURN was indicted on
following charges: conspiracy to commit mail and wire fraud (18. U.S.C. § 1349; count one);
wire fraud (18 U.S.C. § 1343; counts two through four); money laundering conspiracy (18
U.S.C.§ 1956(h); count seven); and money laundering (18 U.S.C. § 1956(a)(2)(A); counts eight
and nine).

was not established as a limited liability company until July 2003. According to its Limited Liability Operating Agreement dated July 23, 2003, FoodPro owned 50.46% of GSP; AS Vahenurme Agro also known as AS Vahenurme, Vahenurme Finland Oy ("ASV"), an Estonian company partially made up of Finnish investors, owned 35.78%; and, Golden Sierra Management ("GSM") owned 13.76%.

13.    On September 25, 2003, WASHBURN signed a loan agreement on GSP's behalf with OPIC. Pursuant to the agreement, GSP pledged to contribute $7,610,138 to fund the Estonian milling and bakery project, which had a total cost of $16,995,138, and OPIC agreed to lend the remaining $9,385,000. In supporting documents, including an operating agreement, disbursement requests and board of director's minutes, GSP's members agreed to fund GSP's $7,610,138 investment in the project as follows: FoodPro, $3,839,978 in cash; ASV, $698,178 in cash plus an additional $2,024,715 through two property contributions; and GSM, $1,047,267 in equity. As part of the agreement, the GSP partners signed membership pledges, which pledged the partners' equity interests in GSP as collateral for the loan – WASHBURN signed for FoodPro, Antti Aleksanteri Koro signed for ASV, and TAPANI PENTTI OLAVI KOIVUNEN[3] signed for GSM as its managing member. Over time, GSP submitted all of these documents to OPIC to support its loan.

14.    In the same September 25, 2003, loan agreement signed by WASHBURN, GSP identified $7,100,00 of equipment costs. In its subsequent application to OPIC for its first disbursement of funds, GSP identified $7,214,000 in costs ($3,989,250 for milling equipment and $3,224,750 for bakery equipment). Also in September, 2003, GSP had entered into contracts to purchase the milling and bakery equipment at the above-referenced prices from Farmers Financial Services ("Farmers").

**B.    FRAUDULENT EQUITY CONTRIBUTIONS AND EQUIPMENT PURCHASES**

15.    This investigation has revealed that contrary to their representations to OPIC, two of GSP's members – FoodPro and ASV – did not make their promised capital contributions. In a facsimile sent by WASHBURN to OPIC on March 28, 2003, WASHBURN advised OPIC that FoodPro had interested investors who would help them raise their $3,800,000 cash capital contribution. WASHBURN assured OPIC that there would be, "no doubt", a side agreement by which the investor

---

[3] As part of the indictment referenced in Paragraph 7, KOIVUNEN was indicted on following charges: conspiracy to commit mail and wire fraud (18. U.S.C. § 1349; count one); money laundering conspiracy (18 U.S.C.§ 1956(h); count seven); and money laundering (18 U.S.C. § 1956(a)(2)(A); counts eight and nine).

would share in the gain on the project in exchange for placing their funds at risk. WASHBURN further assured OPIC that this agreement would in no way affect FoodPro's ownership or control over the project.

16. In a facsimile sent by WASHBURN to OPIC[4], WASHBURN provided a letter of interest for Project Finance Development International, LLC (PFDI) to provide an income stream to the GSP project. The letter of interest was signed by SERGEI VLADIMIROVICH SHKURKIN, as the Executive Director of PFDI. A Statement of Information filed on May 19, 1999 with the State of California Secretary of State lists PFDI as having SHKURKIN and DONALD WAYNE DANIELS[5] as American-based members along with other foreign members. In an email, OPIC had stated their assumption that PFDI was foreign-owned and based in Geneva; OPIC requested accounting from GSP to show an expected 25% U.S. citizen equity contribution.

17. In another facsimile dated May 2, 2003, WASHBURN submitted to OPIC a letter of intent from DANIELS, on behalf of and as the managing partner for the Eagle-Jack Group, to invest up to $3,800,000 with FoodPro for the GSP project. Supporting information about Eagle-Jack Group revealed that DANIELS and Peter Bell were co-owners of the newly proposed investment group Eagle-Jack.

18. Ultimately, instead of Eagle-Jack Group, Treston Industries ("Treston"), also owned by DANIELS, provided funds that made up the combined $4,538,156 cash capital contributions of FoodPro and ASV. Treston deposited the money into GSP and ASV bank accounts. As will be more fully explained below, however, this money was transferred back to the same Treston bank account from which it came within a very short period of time and was not apparently used to fund the project in Estonia. Further, OPIC was never advised that Treston provided a loan to GSP to create the appearance that FoodPro and ASV had made their required equity contributions.

19. Specifically, between September 22, 2003, and October 29, 2003, five wire transfers were used to send $3,839,978 – the amount FoodPro pledged as its

---

[4] The typed date on the facsimile was March 4, 2003 but the faxed stamp reflected a date of April 4, 2003. The letter of intent was dated April 2, 2002.

[5] As part of the indictment referenced in Paragraph 7, DANIELS was indicted on following charges: conspiracy to commit mail and wire fraud (18. U.S.C. § 1349; count one); wire fraud (18 U.S.C. § 1343; counts five and six); money laundering conspiracy (18 U.S.C.§ 1956(h); count seven); and money laundering (18 U.S.C. § 1956(a)(2)(A); counts eight and nine).

BAGCHI AFFIDAVIT             5

contribution – from a DANIELS-controlled Charles Schwab account,[6] held in the name of a company known as Treston Industries (the DANIELS account), to a Wells Fargo Bank account[7] held in the name of GSP.

20. Likewise, between November 3, 2003, and November 11, 2003, two wire transfers were used to send $698,178 – the amount ASV pledged as its contribution – from the DANIELS account to an ASV bank account. Between November 10, 2003, and November 14, 2003, two wire transfers were used to send $698,178 from an ASV account to the above-referenced GSP Wells Fargo account.

21. Within a few days of GSP's receipt of these funds (totaling $4,538,156), almost 99% of the funds (or $4,488,156) were transferred to Farmers' bank account, ostensibly to acquire bakery and milling equipment for the project. Within one to ten business days of Farmers' receipt of each of the seven deposits from GSP, more than 99% of the funds ($4,463,156) were wire transferred out. In six cases, the money was wired directly back to the original DANIELS account. In one case, $300,000 was first sent to a WASHBURN-controlled account[8] held in the name of a company known as PADEC before $299,900 of that money was sent to back to the original DANIELS account. As a result of these circular transactions, more than 98% of the funds wired out of the DANIELS account returned to that same account within a very short period.

22. KOIVUNEN was interviewed by myself and Special Agent Keith L. Nelson on November 24, 2008. KOIVUNEN advised that on June 13, 2003, DANIELS, WASHBURN, SHKURKIN, and KOIVUNEN met in the Stockton, California offices of FoodPro. According to KOIVUNEN, during the meeting, it was agreed by everyone present that DANIELS would provide the cash equity financing for the project. In exchange, DANIELS would be paid 25% after two years, which amounted to $1,100,000. Although KOIVUNEN did not recall the total amount of financing, he acknowledged that it must have been approximately $4,500,000 since 25% would equal $1,100,000. Prior to disbursing funds to GSP, OPIC was never told that DANIELS' money was actually a loan as opposed to an investment nor that repayment to DANIELS was given priority over repayment of the OPIC loan.

---

[6] The wiring instructions from money sent from the Charles Schwab account shows the ordering bank account to be in San Francisco, California.

[7] The GSP Wells Fargo Bank account was opened in San Jose, California.

[8] The account was a Fremont Bank account.

BAGCHI AFFIDAVIT                6

23.    On June 1, 2009, the Honorable Kimberly J. Mueller, U.S. Magistrate Judge, United States District Court, Eastern District of California, signed a search warrant for the Stockton, California offices of FoodPro. On June 2, 2009, a search of the FoodPro was conducted.

24.    Among the items founds was a cash flow projection for GSP dated October 22, 2003 and labeled "Prepared by MWW[9]." The cash flow projection did not include any of the cash equity contributions by FoodPro and ASV; all expenses for GSP were projected to be paid out of the OPIC loan disbursement. Further, Treston Enterprises was projected to receive $500,000 the day after expected date of the first OPIC loan disbursement. A second payment of $600,000 to Treston was projected for the following month.

25.    The search of FoodPro also revealed a copy of an electronic mail exchange involving SHKURKIN, KOIVUNEN, WASHBURN, DANIELS, and LILIANA IRINA REBEGEANU[10]. The subject line was "Golden Sierra cash flow" and the message was sent October 25, 2003. KOIVUNEN commented that adjustments should be made to the Treston payments. KOIVUNEN added "The total payment is $1,151,993 ... (30% of $3,839,978 is 1,151,993)."

26.    On the following day, SHKURKIN responded to KOIVUNEN, DANIELS, WASHBURN, and REBEGEANU. SHKURKIN wrote the following:

> "I seem to remember that at the meeting in Stockton when this draw schedule was discussed it was mentioned that the amounts were necessary in order to be able to draw the second and third draws within the time schedule. I believe that we all agree that it has been very difficult to move forward without operating capitol. It is very important to draw as much as possible as soon as possible since we do not have an alternative line of credit. This is essential to keeping on schedule. The accelerated draw for marketing[11], Food Pro's services and equipment is based on that. That and

---

[9] WASHBURN's initials are MWW.

[10] At the time, REBEGEANU was a FoodPro employee and served as the Project Manager/Engineer for GSP. As part of the indictment referenced in Paragraph 7, REBEGEANU was indicted on following charge: conspiracy to commit mail and wire fraud (18. U.S.C. § 1349).

[11] Sergei Shkurkin and Associates (SSA) is a limited liability company which was incorporated in the State of California on August 21, 2001. SHKURKIN is the CEO, manager, and 50% owner of the company. On September 17, 2003, SSA and Golden Sierra, LLC entered into a 24-month contract for SSA to provide marketing research, organization, and implementation for Golden Sierra, LLC. In total, GSP paid SHKURKIN approximately $70,170

BAGCHI AFFIDAVIT                    7

other items are drawn at the level they are in order to be able to provide documentation that triggers the next draw. Get your proposal in for your services and an accelerated draw of your fee can help support an optimized draw schedule. The first draw is very important and a very sensitive subject because it provides much needed relief to our respective organizations. We have all had a long dry spell on this project and we all need to fill our tanks up to keep our machines on the road. Our method of living and working requires waits of months and in many cases years before a payday. When that payday comes people are very touchy about it. I can't imagine your tank is that full either. We all have the same needs here. Let's work together to getting them taken care of."

27. The following day, DANIELS responded to KOIVUNEN, WASHBURN, SHKURKIN, and REBEGEANU. DANIELS wrote "Jesus...this is crazy all of this is being discussed via email...if we need another meeting, let's have it.."

28. WASHBURN was interviewed by myself and Special Agent Nelson on July 28, 2009. WASHBURN advised SHKURKIN and WASHBURN both knew DANIELS and approached him to borrow $3,800,000 to front FoodPro's equity contribution. DANIELS provided the $3,800,000 in different tranches. OPIC loan funding was to be used to pay back DANIELS's loan and fee.WASHBURN and DANIELS drew up the loan but SHKURKIN knew the details of the loan and the transactions.

29. GSP received OPIC's first loan disbursement of $4,199,440 on December 24, 2003[12]. On December 26, 2003, GSP transferred $2,724,022 to Farmers and, on December 29, 2003, Farmers paid $500,000 to Treston.

30. As was detailed in Paragraphs 17, 18, and 19, DANIELS, doing business as Treston Industries, provided GSP with $4,538,156 which monies were transmitted over seven separate wire transfers. GSP's net repayment to DANIELS included the entire amount plus $424,900[13]. Since the money was outstanding from

apparently pursuant to the contract.

[12] OPIC's loan disbursement was wire transferred to the San Jose, California account of GSP. Similarly, OPIC's second loan disbursement of $3,719,046 on October 19, 2004 was also wire transferred to the same GSP account.

[13] As detailed in Paragraph 19, DANIELS received back 98% of the funds provided to GSP as part of the seven circular wire transfers. The missing 2% amounts to approximately $75,100. While DANIELS did ultimately received $500,000 from the OPIC loan disbursement, his net gain was $424,900.

BAGCHI AFFIDAVIT                    8

DANIELS' account for short periods, ranging from two to fifteen days, the effective annual interest rate would have been approximately 550%.

31. The search of FoodPro's offices also revealed evidence of fraudulent representations of equipment costs, including:

   a. A shipping invoice listing Farmers as the shipper and GSP as the consignee for $4,000,000 worth of milling equipment.

   b. A second shipping invoice, showing the same invoice date, invoice number, shipper, consignee, and product description but the listed value was only $800,000.

   c. An Excel spreadsheet of a cost report for GSP labeled "Cost Report - Official Copy: OPIC". This version of the cost report reflected approximately $7,600,000 in equity contributions, $4,000,000 in milling equipment costs, and $3,200,000 in bakery equipment costs.

   d. A second Excel spreadsheet of a cost report for GSP labeled "Cost Report" with a handwritten note "Real" and "Copy only to MWW." This second version did not reflect any equity contribution section, and listed the milling equipment at approximately $800,000 and the bakery equipment at $1,000,000.

32. REBEGEANU was interviewed by myself and Special Agent Nelson on July 13, 2009. REBEGEANU advised that there was one set of records for the investors and a second set for OPIC. The purpose of the set of records for OPIC was to get more money to cover the investor's contributions and commissions. WASHBURN directed her to maintain both sets of records and SHKURKIN, DANIELS, KOIVUNEN, and others knew there were two sets of records and that one set of invoices did not reflect the true value of the equipment.

33. The funds GSP received from OPIC did not go towards the acquisition of the referenced equipment. Although GSP advised OPIC that it intended to, and did, acquire $7,212,178 worth of equipment, the financial records, including wire transfer reports, indicate otherwise. Of the $7,212,178 that GSP sent to Farmers to purchase equipment, $4,163,156 went directly to Treston, and $2,499,022 went to PADEC. Of the $2,499,022 transmitted to PADEC, another $299,900 was returned to Treston and $810,000 went to KOIVUNEN, which was used to fund the purchase of one of the properties that ASV had already pledged to GSP. Of the remaining funds, $800,000 went to known milling equipment supplier Pendleton Mills (and appears to have been used to purchase equipment), and another $360,000 was sent to GSP accounts in Europe allegedly to acquire an existing bakery in Estonia[14], which was not one of the authorized uses of the

---

[14]KOIVUNEN advised the auditors hired on OPIC's behalf of this bakery expense during an April 29, 2005 interview.

funds. In other words, with the exception of the $800,000 that went to Pendleton Mills, the vast majority of the $7,212,178 that GSP attributed to equipment costs does not appear to have actually been used to purchase equipment.

## C. EXTORTION-RELATED CONDUCT

34. During the interview with KOIVUNEN (referenced in Paragraph 20), KOIVUNEN advised that he was introduced to DANIELS by SHKURKIN. KOIVUNEN said that DANIELS was willing to loan money to GSP but that DANIELS expected to earn 30% to 50% annually on his loan.

35. During a conversation with a third-party about GSP's equity financing that I listened to contemporaneously, SHKURKIN advised that 1) GSP didn't have the required equity contributions; 2) he introduced the Finns to a "guy in California" and the "guy" wanted 30% on his money and; 3) "they didn't want to pay the guy and ... that got sticky." DANIELS lives in California and I believe SHKURKIN was referring to DANIELS. In addition to SHKURKIN and DANIELS being partners in PFDI, they are each half-owners[15] of Tuscarora Investments International, LLC, which advertised itself on the internet in business alliances with FoodPro and Farmers.

36. In an electronic mail dated October 20, 2004 copied to SHKURKIN and Arkady ZALAN[16], WASHBURN advised GSP's Finnish partners that investor representatives, including two Americans and one Russian were interested in a face-to-face meeting to address the fulfillment of all agreements.

37. In a follow-up electronic mail response on October 21, 2004, SHKURKIN addressed KOIVUNEN, with copies to WASHBURN, ZALAN, and GSP's Finnish partners that "[y]ou knew exactly what you were getting into. We were very clear. The investors are frankly very concerned and ask that I attend a meeting with you and all of the GS shareholders to insure that nothing is misrepresented and misinterepreted."

38. On November 15, 2004, a meeting involving members of GSP's Board of Directors was held in a hotel in Helsinki, Finland. According to a Finnish police

---

[15] Ownership information for Tuscarora Investments International, LLC provided by 2003 Schedule K-1 forms filed with the IRS.

[16] At the time, ZALAN was the Director of European Operations for FoodPro.

report[17], the following individuals attended: WASHBURN and ZALAN, both
FoodPro employees; Jussi Jaako Knaapi, Antti Aleksanteri Koro, and Kimmo
Tapio Saaristo, all from ASV; KOIVUNEN from GSM; SHKURKIN and an
individual identified as Russian and named "Gennadi."

39.    According to a Finnish Police report GSP's Finnish members were met in the
       lobby by ZALAN and "Gennadi." The entire group convened in a conference
       room inside the hotel. There, "Gennadi" read a statement in which he demanded
       GSP to pay $650,000 to Treston/DANIELS and stated that, if the sum was not
       paid, it would be collected from the company and its owners by "all means
       necessary," which at least one witness described as a threat made "mafia-style."
       "Gennadi" advised that: (a) Treston was an off-shore company and not subject to
       the law of America, Estonia, or any other country; and (b) a $3,300,000 loan with
       an agreed-to interest rate of 30% had been made, which meant the lender was
       owed $1,150,000 in interest. Over the course of the meeting, it became clear that
       $500,00 had been paid and $650,000 was the remaining payment.

40.    Knaapi sent an electronic mail to OPIC a few weeks after the meeting which
       stated the following: "Gennadi" made it clear during the meeting that he would
       work outside of any laws. Knaapi asked during the meeting if the money Treston
       provided to GSP was illegal. WASHBURN stated yes and ZALAN added that
       there was no intent to invest the $3,800,000 into Golden Sierra Partners but rather
       to give the impression that the capital contribution had been made. ZALAN also
       said a flat fee of $1,150,000 must be paid back. According to a March 29, 2005,
       electronic mail from KOIVUNEN, ZALAN confirmed that FoodPro's $3,800,000
       capital contribution was not intended to remain in Golden Sierra Partners and was
       taken out soon after the initial payments in 2003.

41.    Pursuant to a Letters Rogatory, interviews of Saaristo, Knaapi, and Koro were
       conducted in September, 2008. Saaristo stated that he considered Gennadi's
       statement to be a threat. He considered it especially threatening when he said that
       he would use whatever means necessary. Knaapi stated that he considered
       Gennadi's presentation to be a definite threat directed towards the Finns: we[18]
       became quite frightened and agreed to report the matter to the police. Koro stated
       he considered Gennadi's statement to be extortion and a threat and that Gennadi
       was a short, muscular individual who had a threatening air about him.

42.    Knaapi was asked during the same interview to explain the relationship between

----

[17] A few days after the meeting, some of GSP's Finnish partners filed a report with the
Helsinki Police.

[18] I believe that Knaapi was referring to himself, Koro, Saaristo, and Koivunen.

DANIELS and SHKURKIN and why SHKURKIN was included in the meeting. Knaapi said that WASHBURN had announced that two investors would be at the meeting and he concluded that SHKURKIN was one of the investors and DANIELS was the other. Knaapi added that while the threat was only directly made by Gennadi, WASHBURN, SHKURKIN and ZALAN were definitely of the opinion that the money had to be paid.

43.   Koro was asked during the same interview who convened the meeting. Koro provided the following information in response: SHKURKIN convened the meeting. WASHBURN announced that DANIELS wants money and GSP had to pay. Koro stated that he did not know the individual in question and expressed amazement as to why they should pay. SHKURKIN attempted to reassure us and called us to come to the Hotel Strand in Helsinki. Koro was also asked who represented the American investors and he said that the only ones who come to mind are SHKURKIN and WASHBURN.

44.   ZALAN was interviewed by myself and Special Agent Matthew B. Eads on July 23, 2009. ZALAN stated that DANIELS asked ZALAN to find someone to convince the Finns that DANIELS's money came from the Russian mafia. ZALAN did not know any members of the Russian mafia and instead asked a friend's relative named Gennadi who lives in Israel[19]. DANIELS deposited $5,000 into ZALAN's Fremont, California Citibank checking account to pay for Gennadi's expenses. Prior to the meeting, ZALAN, WASHBURN, and SHKURKIN jointly crafted the note that Gennadi read. ZALAN did not remember the exact verbiage but agreed that it used phrases like "outside of anyone's laws" and "all means necessary." The purpose was to pressure the Finns to pay the rest of the money owed to DANIELS. Both WASHBURN and SHKURKIN completely understood the purpose of the note. WASHBURN, SHKURKIN, ZALAN and KOIVUNEN knew that the cash contributions were borrowed from DANIELS and that $1,100,000 was agreed to be paid as a fee.

45.   Citibank bank statement addressed to ZALAN's Fremont, California address confirmed that a $5,000 check from a company owned by DANIELS[20] was deposited into ZALAN's checking account five days prior the extortion meeting in Helsinki. Debit card transactions for the same account show that ZALAN paid for travel related services out of Israel (Gennadi's reported country of origin) and hotel charges at the same hotel where the extortion meeting took place.

---

[19] Zalan commented during the interview that Gennadi was a poor choice because he could not portray himself as big enough and tough enough.

[20] DANIELS is part owner of Great Valley Land Company and the check was signed by DANIELS's business partner in the company Greg Nunley.

BAGCHI AFFIDAVIT                    12

46.   WASHBURN was interviewed by myself and Special Agent Nelson on July 28, 2009. WASHBURN advised that WASHBURN, ZALAN, SHKURKIN, and maybe DANIELS attended a meeting with the Finnish investors. The meeting was called to intimidate the Finnish investors. ZALAN, WASHBURN, DANIELS, and SHKURKIN all agreed they would pressure the Finnish investors by bringing a Russian gangster to the meeting. ZALAN brought a friend to the meeting to act as a Russian mobster and he told the Finnish investors if they did not pay back the money, they would be kneecapped and things like that.

47.   DANIELS was interviewed by myself and Special Agent Nelson on July 31, 2009. DANIELS advised that the project needed to show cash equity. The cash that DANIELS provided went into bank accounts and came right back out. DANIELS wanted to control all the bank accounts to minimize his risk. DANIELS, KOIVUNEN, SHKURKIN, and WASHBURN all understood the terms of loan. DANIELS barely remembered WASHBURN getting a supposed Russian Organized Crime figure to threaten KOIVUEN. DANIELS instead wanted to get a video of KOIVUNEN sleeping with a prostitute and threaten to show that to KOIVUNEN's wife as blackmail. DANIELS added that he did not know why he was telling this to the FBI.

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

BAGCHI AFFIDAVIT                    13

Based on the facts provided in this criminal complaint, there is probable cause to believe that SERGEI SHKURKIN conspired to collect extensions of credit by extortionate means, in violation of 18 U.S.C. § 894.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

K.S. BAGCHI, Special Agent
Federal Bureau of Investigation

Reviewed and approved as to form:

Peter B. Axelrod
Assistant United States Attorney

SWORN TO AND SUBSCRIBED
BEFORE ME ON THIS / 6 DAY OF SEPTEMBER, 2009

HON. BERNARD ZIMMERMAN
UNITED STATES MAGISTRATE JUDGE

BAGCHI AFFIDAVIT                    14